IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| TIM LEPAGE, | |
| Plaintiff, | |
| v. | Case No. 5:22-CV-4020-JAR |
| CITY OF SALINA, KANSAS and LARRY MULLIKIN, | |
| Defendants. | |

## MEMORANDUM AND ORDER

In this removal action, Plaintiff Tim LePage brings claims against his former employer, the City of Salina, Kansas ("the City"), where he worked as a firefighter until June 2021. He alleges a retaliation claim under the Fair Labor Standards Act ("FLSA"), and state law claims of retaliatory discharge and defamation. LePage also alleges a defamation claim against Defendant Larry Mullikin, a former Chief of the Salina Fire Department, who proceeds pro se. Before the Court is the City's Motion for Summary Judgment (Doc. 28), which is fully briefed. Also pending are Defendant Mullikin's Request for Summary Judgment (Doc. 33), and LePage's Motion to Strike (Doc. 37) Mullikin's motion for summary judgment because it was filed more than two weeks after the dispositive motions deadline passed. As explained more fully below, the Court grants the City's motion for summary judgment on LePage's only federal claim in this matter—retaliation under the FLSA—and declines to exercise supplemental jurisdiction over the remaining state-law claims. The Court therefore finds that Mullikin's motion for summary judgment and LePage's motion to strike are moot and remands the state-law claims to state court.

**I.	Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1] In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2] "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the non-moving party."[3] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6] Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Lab'ies, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[10] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[11]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]

## II.   Uncontroverted Facts

The following material facts are uncontroverted, stipulated to, or viewed in the light most favorable to LePage as the nonmoving party.

The Salina Fire Department ("SFD") hired Plaintiff Tim LePage in 1999. In 2012, he became a Fire Captain. LePage was considered a good officer and his final evaluation rated him as "Outstanding" in all criteria.[13] When LePage became Fire Captain, Defendant Larry Mullikin was Fire Chief. The battalion chiefs ("BCs") supervise the fire captains. In 2012, the BCs were Calvin Kelsey, David Turner, and Scott Abker. At some point, Kelsey was replaced by Herrick Herzog; Herzog left the SFD in 2018. LePage applied for Herzog's BC position, but SFD hired John Goertzen instead. Goertzen became LePage's supervisor. Eventually, Kevin Royse became Fire Chief and held that position until LePage's retirement.

---

[10] *Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[12] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[13] Doc. 38-1 at 72–76 (Ex. C). Plaintiff's counsel is encouraged to review the Court's local rules and administrative procedures. Exhibits to motions should always be <u>separately</u> attached and labeled to allow the Court to easily access them. Here, the Court was required to wade through a 148-page document containing all of Plaintiff's eight exhibits, which were not even bookmarked.

### *LePage's Investigation into BC Time Off*

In September 2019, LePage began working with Human Resources Specialist Diane Turner on a project to save money. Specifically, LePage began keeping track of the days BCs were taking vacation, knowing that their use of vacation would require more captain overtime, costing the City money. LePage began what he considered to be an in depth investigation with Human Resources ("HR") on this issue because HR did not have access to the DataTracker and "FD outlook calendar." LePage would send HR the days he knew BCs were gone and the reason they had provided. LePage believed that

> all three [BCs] were . . . taking ten days of vacation, reporting they were on duty, thusly banking those hours and then taking an additional five days off, reporting it correctly and selling the other five days. After a week or two of review, it was found to be well north of $100K stolen in the previous 6 years.[14]

On October 14, 2019, LePage began sending Turner data packets of screenshots he took of DataTracker, the SFD's internal software for staffing, training, and scheduling. The screenshots showed the BCs' time off and, according to LePage, reflected that they were going on vacation but reporting that they were on duty.

On November 21, 2019, LePage met with Turner, Human Resources Director Natalie Fisher, and Deputy City Manager Jacob Wood and discussed with them the DataTracker software and how it worked. Fisher and Wood did not indicate to LePage that they would be taking "certain action," at the conclusion of the meeting.[15] After the meeting, LePage continued to correspond with Turner about when the BCs were gone. Turner would occasionally contact

---

[14] *Id.* at 78 (Ex. D).
[15] Doc. 29-2 at 107:10–14.

4

LePage and ask for additional information about the alleged time theft, gather more data, provide passwords, etc.

LePage became frustrated because he believed the investigation "died" soon after this. He was told that nothing would happen until after the holidays. He met with Fisher about his time theft allegations on January 29, 2020. LePage continued to send HR information when a staff member went on vacation, and sometimes he would "get a reply back saying they lied again."[16] He believed after the COVID pandemic began that the investigation had been completely forgotten. Finally, in April 2020, LePage retained counsel "to figure out [his] next step."[17] LePage and his attorney met with City Manager Mike Schrage on May 6, 2020, and asked about the delay in the investigation. Schrage told them that the pandemic had caused some delay, but that there should be some action soon. Seeing no action, LePage contacted Schrage again on June 9, 2020, but did not receive a meaningful response to his inquiry.

LePage continued to reach out to Turner, Fisher, Wood, and Schrage in late 2020 and early 2021, including reporting additional instances of what he considered to be time fraud. During this time, LePage vocally criticized the BCs when talking to other firefighters, telling them he believed that the BCs were abusing the time system, referring to it as "theft," "stealing," and "changing their time cards."[18] He told Jame Simpson in February 2020 that he was "compiling information on chiefs that will lead to offenses of theft and distortion."[19] He told Simpson that he was "going to give [him] an early Christmas present."[20] LePage also shared his

---

[16] *Id.*

[17] Doc. 38-1 at 78 (Ex. D).

[18] *See* Doc. 29-2 at 146:3–150:8.

[19] *Id.* at 149:10–16.

[20] *Id.* at 152:3–4.

5

beliefs about the BCs' time fraud with Chad Scoville, Jesse Levin, Andy Harper, and Dan Rowson prior to March 2021.

On March 9, 2021, LePage met with Wood about the investigation. Wood "made clear to [LePage] there would be multiple firings," and "multiple openings at the fire department."[21]

LePage never complained that the City was violating the FLSA. He never alleged that the City failed to pay him or any other firefighter wages earned.

### *March 29, 2021 Meeting*

On March 29, 2021, between 8:00 and 9:00 a.m., LePage accessed the City's electronic time sheet system used to record administrative time. He was authorized to access the electronic time sheet for the staff when he was "acting battalion chief," but otherwise, he would not typically access it for anyone other than himself.[22] Wood and Fisher did not ask LePage to access the electronic time sheets and provide them with information. On March 29, LePage had returned from vacation and was checking his time in the system when he noticed that a BC was off, so he looked more closely. While LePage was in the system, Goertzen called him and asked why he was accessing the "staff side" of the electronic time sheets, to which LePage responded, "Yeah, I'm making sure you guys are doing it right."[23] Goertzen replied: "There's going to be fallout from this," before hanging up.[24]

LePage immediately called Wood and told him that "the gig is up . . . they got me . . . what do you want me to do?"[25] Wood told LePage not to reveal the information and to "take

---

[21] Doc. 38-1 at 55 (Ex. A at 219:10–220:2).

[22] Doc. 29-2 at 108:22–23.

[23] *Id.* at 182:22–23.

[24] *Id.* at 182:24–25.

[25] *Id.* at 183:1–15.

[his] lumps," because "[w]e will tear up any paperwork—if they write you up, we will tear it up when it gets over here."[26] He also told LePage that "they" had been "out to get" LePage for a long time.[27] He told LePage that Goertzen had arrived to talk to him during their phone conversation.

Shortly thereafter, LePage received a phone call to report to Fire Headquarters where he met with Royse, Goertzen, Turner, Troy Long, Shane Pearson, and Drew Sprague. LePage audio-recorded the meeting, which is in the summary judgment record.[28] At the meeting, Goertzen explained that "the chiefs" were in a staff meeting, and that when they tried to access the payroll system, they could not because LePage was in it. When Goertzen called him, LePage first said he was looking at his own vacation time, but then admitted he was in the staff section because he was making sure they were "doing it right." Goertzen explained that LePage was not authorized to be in the "staff side" of the payroll system when he was not an acting BC and that Turner had confirmed to them that LePage accessing that information was a breach of his access rights to confidential information. Goertzen asked for LePage's input and response, but LePage repeatedly told them that he had nothing to say, or that he was "not at liberty to say."

Finally, LePage told them he wanted to go home for the rest of shift, and Goertzen agreed. Goertzen stated that "I want you to know that I didn't call you down here to—to reprimand you or anything. I just want to know what—where you're at. That's all."[29] Chief Royse asked LePage if there were things going on in his personal life they could help with, to

---

[26] *Id.* at 185:10–14.

[27] *Id.* at 184:1–23.

[28] Doc. 31 (documenting that Ex. E, a flash drive containing audio-recording of March 29, 2021 meeting, was filed conventionally).

[29] Doc. 29-2 at 201:3–8.

which LePage responded, "I'm working through some hurdles."[30]  Royce told LePage that the fire department was like a family and they were all there for one another if he needed them.  He told LePage that he could contact him personally if he wanted to talk.  After the meeting and after his relief at the station arrived, LePage texted Wood that he was leaving the station and "I can't do this anymore."[31]  LePage testified at his deposition that Long and Turner "had that look of they wanted to crawl across that table and get me.  David Turner was just red-faced the entire time."[32]

### *LePage's Leave and Retirement*

The next morning, LePage emailed Wood and Fisher.  He summarized the meeting he had at Fire Headquarters, including his impressions of the six "chiefs" who attended the meeting: "A six-on-one approach is very dominating and a fearful place to be.  The anger in their eyes, facial expressions and body language was real and palpable."[33]  He told them that Goertzen texted him the night before, instructing him to report to headquarters that day at 10:00 a.m. for a staff disciplinary hearing.  Then, he relayed his concerns about the situation:

> Yesterday, Jacob requested that I just take my lumps so we don't expose the investigation.  But at this point I'm asking for your help and the city manager's office help in curbing any disciplinary action by staff.  You know good and well my actions are above board and for a greater good.  Their overreaction just proves further they have something to hide.  My crime is looking at timesheets . . . .
>
> I can tell you right now that I am in no physical or mental condition to perform my duties.  They have likely suspected me over the past year and a half and yesterday, it was confirmed.  My job requires extreme clarity when dealing in high stress emergency

---

[30] *Id.* at 201:22–24.

[31] *Id.* at 207:17–25.

[32] Doc. 38-1 at 52 (Ex. A at 205:16–19).

[33] Doc. 29-6 at 3.

8

> situations as well as a coordinated team approach. Trust between myself and staff has been broken and I truly believe my safety is in jeopardy. If I continue to work under this administration. It is to me, a hostile work environment.
>
> I want to seek from you, a timeline on when you think any action will occur from the time card fraud situation as well as my options for leave of absence. I have sacrificed so much for this organization and I'm so close to the goal line. I will be retiring June 21. I have several more questions as well as options to run by you and Jacob.[34]

This was the first time LePage had characterized his work environment as hostile to Wood or Fisher.

Wood replied to LePage's email that he and Fisher were "working through all the details, but we will be able to place you in a leave status. We will be providing formal communication to you and the department tomorrow."[35] LePage replied that this news was a "huge relief."[36] Wood then replied, "I know this has been tough for you and I wish we had moved more quickly on all of it. I apologize that I was not able to make that happen on this end."[37] The City placed LePage on paid leave, per his request. He remained on paid leave until he retired in June 2021.

### III. Discussion

On April 15, 2022, the City removed this case from the Saline County District Court. The jurisdictional basis for removal was that LePage's FLSA retaliation claim falls within the Court's original jurisdiction.[38] Because the Court had original jurisdiction over that federal claim, it had supplemental jurisdiction over the remaining state-law claims in this case for

---

[34] *Id.* (ellipses in original).

[35] *Id.* at 2.

[36] *Id.*

[37] *Id.* at 1.

[38] 28 U.S.C. § 1441(a).

9

retaliatory discharge and defamation.[39] The City has now moved for summary judgment on all claims asserted against it by LePage, including the FLSA retaliation claim. As described below, the Court grants the City's motion as to the FLSA claim. Because that is the only claim upon which this Court has original jurisdiction, it declines to exercise supplemental jurisdiction over the remaining state-law claims and remands this matter to state court.

### A.     FLSA Retaliation

LePage alleges a claim of retaliation by the City in violation of the FLSA. The FLSA prohibits any person from retaliating against an employee for asserting rights under the statute.[40] Specifically, the FLSA prohibits retaliation "because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee."[41] A claim for FLSA retaliation based on circumstantial evidence is analyzed under the familiar *McDonnell Douglas* burden-shifting framework.[42]

> Under the first prong of the *McDonnell Douglas* framework, the employee must establish a prima facie case of retaliation by demonstrating (1) []he engaged in protected activity under FLSA, (2) []he suffered an adverse employment action contemporaneous with or subsequent to the protected activity, and (3) a causal connection between the protected activity and the adverse employment action. . . .
>
> Under the second prong of the *McDonnell Douglas* framework, the burden of production shifts to the employer to offer a legitimate non-retaliatory reason for the adverse employment action. The employer need not prove the absence of retaliatory motive; rather, the employer need only produce evidence that would dispel the inference of retaliation.

---

[39] 28 U.S.C. § 1367(a).

[40] 29 U.S.C. § 215(a)(3).

[41] *Id.*

[42] *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1206 (10th Cir. 2004) (citation omitted).

> Under the third prong of the *McDonnell Douglas* framework, the burden shifts back to the employee to show genuine issues of material fact exist regarding whether the employer's proffered reason is unworthy of credence.[43]

The City moves for summary judgment on the prima facie case only, arguing that LePage is unable to demonstrate a genuine issue of material fact on the first and second elements. The Court need not address the adverse action element because, as described below, LePage fails to meet his burden of coming forward with evidence that he engaged in protected activity under the first element of the prima facie case.

The City argues that LePage's whistleblower complaints about the BCs' time fraud did not constitute protected activity under the FLSA because they did not involve an accusation that the City violated the FLSA. LePage responds that because his complaints were related to overtime pay, they sufficiently invoked the FLSA to be considered protected activity under the statute. The Supreme Court has made clear that the FLSA's antiretaliation provision covers both oral and written complaints.[44] Whether written or oral, "a complaint must be sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection."[45] This is an "objective" standard.[46]

Here, LePage fails to demonstrate a genuine issue of material fact about whether he engaged in protected activity under this objective standard. In terms of content, it is uncontroverted that LePage never explicitly invoked the FLSA when he complained about the

---

[43] *Id.* at 1206–07 (citations omitted).

[44] *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 11–14 (2011).

[45] *Id.* at 14.

[46] *Id.*

BCs' alleged time card fraud. And while this fact standing alone is not fatal to his claim,[47] the substance of his complaint did not involve conduct that is regulated by the FLSA. The FLSA "sets forth employment rules concerning minimum wages, maximum hours, and overtime pay."[48] LePage did not complain about violations of the federal minimum wage or maximum hour laws. Nor did he request overtime wages for himself or others. Instead, LePage complained that the BCs were reporting in the SFD's software tracking system that they were on duty when in fact they were on vacation or administrative leave. Vacation pay is not covered by the FLSA.[49]

Additionally, the context of LePage's complaint focused on what he repeatedly described as "theft"—he complained that the BCs were "stealing" from the City by reporting themselves on duty when they were in fact on vacation or administrative leave. LePage reported to HR when the BCs were off duty, so that HR could then check and see whether their time had been properly classified. The thrust of LePage's complaints were that the BCs' "time fraud" practices essentially stole money from the City. While it is true that a plaintiff need not establish an actual violation of the FLSA in order to demonstrate protected activity,[50] the Court agrees with the City

---

[47] *Pacheco*, 365 F.3d at 1206 (stating that an employee's unofficial assertion of rights under the FLSA is sufficient where the employee requests overtime wages); *Gust v. Wireless Vision, LLC*, No. 15-2646-RDR, 2015 WL 2365511, at *3 (D. Kan. May 18, 2015) (citations omitted).

[48] *Kasten*, 563 U.S. at 4 (citing 29 U.S.C. § 201 *et seq.*).

[49] *See, e.g.*, *Norcom v. Novant Health, Inc.*, No. 20CV00673, 2022 WL 17170949, at *5 (W.D.N.C. Nov. 22, 2022) ("[T]he FLSA deals with minimum wages and overtime—not paid vacations."); *Arjumand v. Laguardia Assocs., L.P.*, No. 14-4618, 2015 WL 1470470, at *5 (E.D.N.Y. Mar. 30, 2015) (explaining that claims for denial of raise and unpaid vacation days are not actionable under the FLSA); *Morke v. Archer Daniels Midland Co.*, No. 10-cv-94, 2010 WL 2403776, at *2 (W.D. Wisc. June 10, 2010) (finding that failure to pay vacation hours is not violative of the FLSA); *Caudle v. Hard Drive Express, Inc.*, No. 19CV11445, 2022 WL 570436, at *6 (E.D. Mich. Feb. 24, 2022) ("Based upon the record, Caudle's complaint immediately prior to being terminated related only to his entitlement to vacation pay, a fringe benefit not protected under the FLSA.").

[50] *See, e.g.*, *Acosta v. Foreclosure Connection, Inc.*, 903 F.3d 1132, 1135 (10th Cir. 2018) (citing *Sapperstein v. Hager*, 188 F.3d 852, 856–57 (7th Cir. 1999)).

that the content and context of the complaints lodged by LePage would not lead a reasonable employer to understand he was asserting rights protected by the FLSA.[51]

LePage suggests that his complaints were protected activity under the FLSA because the BCs' misuse of vacation time required captains to work too much overtime. But the FLSA does not regulate such activity, and LePage offers no evidence that a reasonable employer would understand that he was complaining of an FLSA violation. LePage's contemporaneous notes and emails make clear that he was alleging what he believed was theft and manipulation by his superiors of certain leave and reporting policies. His complaint that the BCs' misconduct caused captains to use more overtime than should have been necessary does not relate to the FLSA, which only requires overtime pay when a nonexempt employee works more than forty hours per week. At best, LePage's allegations have a tangential relationship with overtime pay and there is no evidence that a reasonable employer would understand that his complaint fell within the FLSA's ambit. An allegation that certain employees work too much overtime, without more, is simply not addressed by the statute.

LePage asserts that *Krupa v. Support for You, LLC*[52] is instructive here. In *Krupa*, the plaintiff worked as a bookkeeper for the defendant employer. She testified in her deposition that in her capacity as the defendant's bookkeeper, she advised when an employee should and should not be paid overtime.[53] The district court found that the plaintiff's purported complaint was advice, rather than a complaint, which was provided to her employer as part of her job duties as a

---

[51] *See, e.g.*, *Wilmes v. Packsize, LLC*, No. 19-CV-02749, 2020 WL 1929853, at *3 (E.D. Mo. Apr. 21, 2020) (finding complaints about "unethical business practices" and fraud were not protected activities under the FLSA); *Shadduck v. United Parcel Serv., Inc.*, No. 10 C 2203, 2011 WL 4452210, at *3 (N.D. Ill. Sept. 26, 2011) ("An employee is not, however, entitled to FLSA protection just because he has made a complaint about wages or hours.").

[52] No. 19-01839, 2021 WL 4477971 (N.D. Ohio Sept. 30, 2021).

[53] *Id.* at *5.

bookkeeper.[54] The court relied on Sixth Circuit authority and found that the plaintiff offered "her professional opinion as a bookkeeper to her employer, [which] . . . does not constitute a complaint even under the most generous definition."[55]

Although it is not on point, *Krupa* does discuss whether performing one's job duties rather than asserting the FLSA rights on behalf of oneself or others can constitute protected activity. Under the Sixth Circuit authority upon which the *Krupa* court relied, "[a]n assertion of FLSA rights . . . will normally be specific to one or more employee(s) or a class of employees and will usually be made in the interests of that employee, group or class of employees and, thus, may be adverse to the employer's interests."[56] Here, LePage's complaint did not assert FLSA rights on behalf of himself or others. It is uncontroverted that he did not complain that he or other employees were denied minimum wages or overtime pay that they were entitled to under the FLSA.

Moreover, LePage claims that "he had been expressly tasked with working with HR to review vacation hours and overtime. It was because of this project that he became aware of the issue to begin with."[57] Assuming as true that LePage was investigating the BCs' time off as part of his job duties, it actually provides more rather than less support for the City's position that LePage did not engage in protected activity. Rather than an assertion of FLSA rights on behalf of himself or others, this fact makes his complaint more like the complaint in *Krupa* because it

---

[54] *Id.* at *6.

[55] *Id.* (citing *Pettit v. Steppingstone, Ctr. for the Potentially Gifted*, 429 F. App'x 524, 530 (6th Cir. 2011)); *see also George v. Bd. of Cnty. Comm'rs of Franklin Cnty., Kan.*, No. 05-2515-CM, 2007 WL 950270, at *7 (D. Kan. Mar. 26, 2007) (finding that the plaintiff was performing job responsibilities and not stepping out of role as representing the employer by asserting rights on behalf of himself or others).

[56] *Krupa*, 2021 WL 4477971, at *6 (quoting *Pettit*, 429 F. App'x at 530–31).

[57] Doc. 38 at 20.

was made as part of his job duties, rather than on behalf of himself or others. As in *Krupa*, this compels a finding that LePage did not engage in protected activity.

In sum, LePage's complaints did not allege a violation of or relate to the FLSA, and they were not sufficiently clear in terms of content or context to put the City on notice that he was alleging a violation of the FLSA. Moreover, LePage did not assert rights on behalf of himself or others. Therefore, LePage cannot demonstrate a prima facie case of a violation of the FLSA's antiretaliation provision and summary judgment is granted in the City's favor on this claim.

### B.   State Law Claims

The only remaining claims in this matter are asserted under state law. "When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims."[58] The Supreme Court has directed district courts to consider "the values of judicial economy, convenience, fairness, and comity," when making this decision.[59] The Tenth Circuit has instructed courts to consider similar factors.[60] The decision is committed to the district court's sound discretion.[61]

The Court finds that there are no substantial grounds for jurisdiction over the remaining claims for retaliatory discharge and defamation and that the state court is in a better position to evaluate LePage's claims under state law. Accordingly, the Court declines to exercise supplemental jurisdiction over the remaining state-law claims and will therefore remand those claims back to state court.

---

[58] *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (citing 28 U.S.C. § 1367(c)(3)).

[59] *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

[60] *See Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013) (quoting *Anglemyer v. Hamilton Cnty. Hosp.*, 58 F.3d 533, 541 (10th Cir. 1995)).

[61] *Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138–39 (10th Cir. 2004).

**IT IS THEREFORE ORDERED BY THE COURT** that the City's Motion for Summary Judgment (Doc. 28) is **granted on the FLSA retaliation claim**.  The Court declines to exercise supplemental jurisdiction over the remaining state-law claims.  The Clerk is instructed to remand the remaining state-law claims to the Saline County District Court.

**IT IS FURTHER ORDERD BY THE COURT** that Defendant Mullikin's Request for Summary Judgement [sic] (Doc. 33) and LePage's Motion to Strike (Doc. 37) are **moot**.

**IT IS SO ORDERED.**

Dated: March 30, 2023

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE